Preliminarily, I'd like to reserve three minutes' time for rebuttal if the Court will grant it. I'm here today to ask the Court to do two things in what we can only describe as an extraordinary alleged theft of trade secrets case. We need modification of the injunction, which the District Court refused to do, and we need to leave here with an order granting security in an injunction bond to protect our client against the further proofs that the injunction is overly broad and improperly granted. As this Court knows, we've proceeded now almost to, in fact, in excess of two full years in a case in which there are allegedly millions of dollars at stake, there is no bond in place, and we have forensic evidence that shows, unlike any other trade secret case I've ever seen, we don't have the trade secret that supports the injunction in this case. Let me just stop you right there, because I've got to tell you, that Evolver report strikes me as just the opposite of what you just said. The Evolver report. Yeah. Is that what you're talking about? Yes, sir. This forensic evidence? Absolutely, Your Honor. I mean, I thought it was quite damning for your client. Hardly the sort of piece of vindication that you've been looking for. So tell me why it's so helpful. Absolutely. Your Honors, we've all had trade secret cases. When you have a spreadsheet allegedly taken from one entity to another, it's very simple to find the spreadsheet. It shows up. You'll have reports. You'll have e-mails attached to it, all the things that we know forensically and from an evidentiary perspective to do. It's not there. It's not there. And that's why the legal issue I don't even know how you can say that, though. It's on the full report is on Schwartz's thumb drive. Is that right? Could be. Could be. I thought that was what the That is the legal issue that's before this Court. If at best, Mr. Schwartz or Mr. Curtin, who we know were their former employees, had that document at some point in time, it never got to our client's computer system, ever. That's what the Evolver report confirmed. Is there an independent source for the sublist that were found on your client's computers? Again, Your Honor, I don't think the Evolver report shows that that list, the sublist themselves, let's talk about that. Well, but the master and the judge don't agree with your reading of the Evolver report. So, and I think that Judge Watford is saying he's questioning your reading of it. So there is another reading of it. I actually don't think there is. And I'd like to answer his question on the terminology. There's the big report, which we all call the September 2009 report, 1,200 customers. Mr. Curtin, at worst, sat at a computer in a home office. We didn't have it. Not our computer system. Cut and paste little pieces on the 440 companies, if you add up. Those sublists, Your Honor, we acknowledge are on our client's computer system,  never argued otherwise, at least until we get to trial. The remaining balance of all of the other customers never got to our client. That's the distinction in this case. That's where I would have you draw the line. And that is what the Evolver report shows. It doesn't prove that. And, in fact, I think, I mean, I don't even know if we were reviewing just for clear error whether the lower, the special master in the district court could infer from the Evolver report that you at least had access to the full September 2009 report. Maybe you've only used a portion of it, and that's why it's on your client's computers. But I don't know. How do you say that the Evolver report shows that you never even had access to the full 2009 report? Well, because you admitted it before, too. I don't think we've ever. Since the first day of this case, the fight has always been about whether our client had the full report, whether the improper use of respondeat superior could bind our client for the activities of what the two lower-level salespeople might have done or not. There is no proof in that Evolver report. You can read it cover to cover. You can read the amendments. It will always bring you back, Judge, to the summary. Kagan. Aren't you confusing the statement, there never was any information on our computer computers, with the statement, at a later time, we were unable to find anything on the computer? Aren't those two entirely different statements? They are absolutely two. I think we have support for both, but with respect to the injunction, we clearly have the latter. I think there will be an issue at trial over whether there was ever anything, but the Evolver report, again, I believe shows conclusively a big list, never got there, and even if by some ability to prove it was, circumstantial or otherwise, it hasn't been there since before this litigation commenced in the middle of 2010, and for purposes of an injunction and potential irreparable harm, that's where we're asking the court to draw its focus and attention to the plain error that exists in this case. If we are later found to have misappropriated a trade secret, that is one element under the statute. If we are later found to have misappropriated a trade secret, that is one element under the statute. To be able to further use a trade secret requires that you have access to it, that you can use it, manipulate it, send things from it. We can't do any of that. It's never been done. Can I ask this? Does Schwartz still work for LSA? No. When was he terminated? I do not recall the exact date, but it was in the ---- I'll get that for you. Was he employed at the time that your motion to modify was denied? Yes. He was. And he was subsequently terminated during the deposition phase of this court case. So in terms of even if he has it in his head now, he cannot be there. But at the time your motion to modify was denied, he was still employed and he, it sounds like, he did have access to that and potentially brought it to your client. That would be their allegation. Again, we contend that he didn't and the Evolver report would show that he did not. But the Evolver report doesn't search every aspect of the computer, does it? We claim it does. They imaged our clients' computers, did whatever. Again, this is a court-appointed forensic expert, so I don't control him the way I would my own expert. But he ran the report, has looked through all these places, and it doesn't exist and it can't be accessed. Well, there's an unsomething type of space that it didn't search is what the ---- let's see specifically what. You said it searched everything. Our position is it did because it found the reference that Your Honor mentioned about the thumb drive access in the unallocated space. Unallocated. That's correct. An unallocated space, as I think both sides agree under the Sedona Convention, refers to that part of a computer you can never really get to. It fragments the data. So, again, on a going forward basis, even hypothetically, it could be buried in there someplace, which, again, we contend it is not. You couldn't get to it and use it for purposes of inflicting harm on the plaintiff. This, again, Your Honor, is the person here to help me. Can you remind me just who wiped their computer? That was an individual salesperson named Scott Coburn who testified that he took family photos off of the computer. Okay. But it's impossible to know, given what he did, whether the full report was on his computer, I take it. Again, in an appellate argument, I think it would be almost impossible to tell you that you can't rule it out. But it would have had to have shown up on someone else's first to have been emailed to him. He never worked for the plaintiff. Well, if you review this record, I mean, you're taking very absolute approaches here. But if you actually look at it from start to finish, that the master and the district judge appear to have found that significant – well, first they found that Curtin and Schwartz admitted certain things and they were still employed. The Evolver – if there's a different way to look at the Evolver report, they did not view it to say what you said it did say. And I think that there probably is more than one way. There were a number of, I think, where people that worked for you were found in contempt of – they were actually found soliciting in violation of the injunction before even the modification. So there's a lot of things that you can look at through here that – where it just appears that your side didn't have the best credibility with the court. It's a terrific point. If any human being had ever appeared in front of an officer – Well, they don't look like they're wearing a white hat here. I understand. You know, in terms of – but looking at it, I can't say that there weren't reasons that were given for that. But the district court has never seen a live witness in this case. The special master has never seen a live witness. To me, one of the most egregious findings in this case is that on a credibility finding, the compliance program wasn't sufficient. No witnesses have ever testified in front of anyone in this court case to make those kind of determinations. The district court used very vague language. We pointed all of this out in our briefs. The information. The document. When you drill down on what actually occurred, that's not supported by any evidence that is in this record. And again, it brings me back to if there's one issue I ask this Court to address, it is this question of the respondeat superior. At worst, Mr. Curtin and Mr. Schwartz would be defined in my vernacular as rogue employees. They didn't bring the information. We contend that the Ninth Circuit case law on point is much more applicable than the Fry Oil Cook case that the district judge relied on. If these employees did what they did and it never got past their level, if management said we don't want this information, this is not the way we do business, we do not compete this way, and we couldn't access it even if we wanted it, that's not an injunction that has an evidentiary basis that can be sustained because two people did things out of their home offices in Buffalo, New York, took every possible effort to evade detection, changed the titles in the fields. We've listed all that in our brief. That's not the way a trade secret looks when a file gets imported from one company to another. That's just not the way it looks. And that's why we have drawn the lines as narrowly as we did around the companies that we concede there was some information on. And if that's where the injunction had to stay through trial, terrific. But these plaintiffs have been afforded full and complete relief on 1,200 companies. But another way a trade secret looks is when two people leave one company and they take the records with them and parts of them are found at the other company, they admit that they took them with them, and they're found in contempt on certain other things. That's another way to look at the evidence. Absolutely. And that's the way they're looking at it, of course. Well, but we're not, you know, I think from my perspective your stronger argument has to do with the standard of review. Absolutely. Of the master's report. If the court, district court, used the wrong standard of review, what do we do about that? Well, the first thing, and I appreciate you, the Court, pointing that out, because we've alleged all along that the district court has given way too much authority to the special master. The review, you can read the record. These decisions get turned back. Special master has not been reversed once. The Court says right in its papers it's using a clearly erroneous standard when the Federal rule says it has to be plenary review on these issues. So my client, again, has not had the opportunity to have anyone look at these types of things. So when Your Honor says to me these are the findings of the court, yes, they are. But if we go one layer deeper as to how those findings have been locked into the stone that we're stuck with, again, no witnesses called so far. The contempt, which we mentioned in our brief, never even had a trial on that. If we agree with you that the district court should have addressed all four of the factors set forth in Winter, should we remand to the district court, or can we consider the two factors that the district court failed to address? I think you can consider them here, but I have to be candid. A remand with that specific instruction might get us to the same result, because what is going to have to happen is those factors will have to be applied to the very issues we're talking about here in terms of factual determination. I guess what are your strongest arguments that the balance of equities and public interest favor the modification of the preliminary injunction? There are all of the companies listed in the record that have said we would like to do business with your client, and they are precluded from doing so, we claim, without any evidentiary basis. They have to be taken into account in terms of the balancing of harm. On the other extreme, the plaintiffs have been given, as we mentioned, almost full and complete relief of everything they have sought in this case without security being posted, and again, we contend without an evidentiary basis that we even have access to the very trade secret that is at issue here. Again, as I pointed out at the outset of this argument, when a full volume of a spreadsheet, and again, we went through great pains in our briefs and in the attachments to show you the difference between what I have seen as a lawyer under attorney's eyes protection of the confidentiality order, I understand what that trade secret looks like, and it's detailed and it's massive. And then you compare it to what we actually have. The difference is staggering. And that is to us the difference that has evaded review. It's the difference of what you say you have. They're still alleging that, you know, we have to look at all of that. Of course. And if my client does not have and if there is no proof that we have access to this information, could not have it, we're back to the same situation as we used the line in our brief. They want it initially, and as I contended in our papers, perhaps the district court got it right initially, because you always err on the side of cost, and you don't want the genie out of the bottle in a trade secret case. Do you want to save some time for rebuttal?  And I'm sorry, the clock is right now. Thanks. I'll give you two minutes for rebuttal, and you can answer Judge Watford's question. Thank you. Does the GPO issue still matter? Of course it matters. But the initial contract, as I understand it, has expired, right? But the GPO would affect, and I appreciate the question, the GPO will affect any third-party relationship we want to get into if a single entity that wants to join the GPO is enjoined. Our client can't represent fully GPO. We can service any member of yours that will step forward. It doesn't matter if it's a hospital, bar association. It wouldn't matter, because we won't be able to honor the agreement. Just help me with this, because the GPO contract that I think we have in the record, by its terms, expired back in May of this year? That was the Met Assets Agreement, if I could. Okay. Is there some other GPO agreement that's still? Absolutely. Any GPO, Your Honor, that could possibly want to do business with our client, if one  with the full disclosure, it can service any member that steps forward. Am I factually making that clear to the Court? I mean, I thought that actually was your best case in terms of why the injunction was overbroad, because I didn't understand. Take any of these. I didn't understand how you could have, even if you had the full 2009 report, how you could have put it to use. You can't. It's exactly right. But are you negotiating the terms of new GPO? Our client is so desperate for revenue, given the scope of this injunction, it has to be, again, legally, has to be creative in any way it can. If a GPO presents itself and says we would like to do business with LSA, our client would absolutely do it in a heartbeat, even if it's at a discounted price to those members. But what it has to do factually is be able to say, GPO, if any of your members, and we may not know who they all are, present for service, we have to be able to supply it, or we can't enter the threshold parent agreement. Under the current injunction, we can't get there, because we would be barred by their stay-away list, even though there's no causal connection back to their data. Thank you. Good morning. Good morning, Your Honors. I will be the only one addressing the Court. Thank you. This is my co-counsel, Steve Weinberg. I guess the theme is catching on. Yes, it did. I thought I'd preempt it. If I can, let me first address the standard of review issue, because it is a touchy  I think we have to concede that in initially appointing the arbitrator, the special master, the district court imposed an incorrect standard of review. He didn't do de novo. He was supposed to do de novo, right? That's correct. As to questions of fact, there have to be questions of fact to review, and it seems to me there has to be some action taken in response to the order. This was part of the original injunction order, which included the appointment of the special master and included the clear error review standard. That order was never appealed. It could have been challenged. It never was. Assume there was an error. That error, for the purposes we're dealing with, has been waived. But even if that weren't the case, the question is, does it matter exactly what needed to be reviewed on a factual level? That takes me to the Evolver Report. And candidly, I think it's not just a question of whether it can be interpreted in multiple ways, which it can. The real problem is that that is the only piece of evidence that was submitted. I think – I don't know how many times the LSA has said this is all about the Revolver Report, Evolver Report. It stands or falls on the Evolver Report. Well, what isn't there is any explanation of how the report was generated other than the initial order, which describes the need to get forensics experts in. The report talks about key words that were searched. We don't know what they are. It's a technical report. In some respects, it's opaque. It is at best intentioned in – there is a tension in how it talks about unallocated space, because while it's clear that something was found in unallocated space, as far as we know, there was only one search done for the specific title of the September 2009 report. And the report says we could do further carving in, which is the technical term, I guess, in unallocated space to see if we can find anything else. The unallocated space has not been carved. But we don't know what happened. One of the reasons is this motion was made, as I said, with just this report. No forensic expert to explain it. No testimony from the Evolver team that actually did it. And on top of that, a lot of this direction came from the special master himself. My understanding, although even this isn't in the record, is that the instructions to the forensic team were funneled through him. He directed the report. So he probably understood the report better than anyone. He may have had the technical knowledge. I don't know. But he's the one who made the conclusion that this report did not search unallocated space, except, of course, we know for that one search. And guess what? It did find the report. Mr. Laird. Counsel, let me just stop you, because you were trying to get to why the failure to apply the correct standard of review doesn't matter. And I'm not quite hearing a direct answer. Is that because we're just supposed to apply our own de novo review now and figure out if the findings were correct? No. I think what happened here with the Evolver report was a complete failure of proof. In other words, frankly, the special master and the district judge would have been well within their rights to say there's no evidence here that suffices to warrant vacating or modifying the injunction. We don't know what this report means. You, LSA, who have the burden of proof, have not sufficiently demonstrated what this report means. But there's another part of it as well. It's not just a failure to explain what the report really means with evidence that the special master could consider and that the district court could review de novo. There's a bigger problem, and it runs throughout all of LSA's paper, and I heard it again in argument today. The concept that this document never was in LSA's possession. What they mean by that is that it was never on LSA's network computers. Now, again, the Evolver report doesn't show that, but let's assume that it did, and let's assume that the Evolver report shows it isn't there today. And they also say it didn't reach its senior management team. LSA is so much more than its network. In fact, counsel talked about Curtin and Schwartz working in their home offices. What do employees and salespeople in particular do? They work away from the company. They have their personal laptops. They have their Internet e-mail accounts, Gmail and Hotmail and all of that. None of that was ever examined. But if that's how the employees are doing the company's business, that is the company doing its business. And the Droger case, which is the only case they cite for the proposition, well, we never had the trade secret, I think supports our side of the case much better. In Droger, what happened is an employee took in, according to the plaintiff, took in trade secrets about how to make some kind of backpack, and the defendant said, yes, that happened, but he put it in his desk, we developed our product independently. We didn't use the trade secret. The issue in Droger is about use. The trade secret goes in someone's drawer. No one ever sees it. So there's no use. It's independent development. There's no question about the use in our case. As Judge Watford pointed out, what happened here was Curtin and Schwartz took the masterpiece, they split it up, and they gave it to employees. But we don't know where else that traveled within the organization. Well, could they have just printed it out and given it to someone? It could have. There's any number of ways. It could have been printed out in hard copy. It could have been on flash drives. It could have been in an Internet email account. The sublists remained in the employees' Internet accounts, even though they said they destroyed them. And that's another aspect of this. In opposition to the injunction, LSA employees said, we destroyed every copy. Well, the Evolver report showed that that wasn't true. Anywhere, all of those sublists remained on the system in somebody's email account or in some linked file or in some other way. Evolver found them. They weren't deleted. So what does the Evolver report show? At best, in the most aggressively favorable interpretation of that report, which I do not think the report supports, it is not now, or at time of the imaging, on the company's network. The company is not its network. The company is a network of employees who have email accounts, who have their own laptops, who have their flash drives. We know that it showed up on that thumb drive. Supposedly, Schwartz destroyed all his thumb drives, hit them with a hammer and cut them up, and yet, lo and behold, Evolver shows that apparently it's hard to interpret. He still has it. So coming back to the original question, I think the correct ruling in this case would have been for the special master to say there's not enough evidence here to support any exercise of discretion in your favor, and for the district court to have affirmed that ruling or overruled the objections on the basis that there's no basis on which I can exercise my discretion. There isn't enough proof. Kagan. But that's not what happened. It isn't what happened, but the question is whether, assuming there is a non-waived error with respect to the standard of review, the question is what is the consequence. This Court has the power to affirm a judgment on any grounds supported by the record. And my view is that the record required, because of a failure of proof, required the denial of modification. Yet the Evolver report, no matter what it does, does not show the absence of the full report and the sublists throughout the company. Again, what is the company? We're talking about a document whose only use to LSA or language line, for that matter, has to do with locating and soliciting customers. The salespeople use it. Now, who was Mr. Curtin? He was the national sales manager. No, he wasn't one of the ---- Is he still there? He's not there either. He was replaced as national sales manager by another former employee of language line who was in charge of major sales. I forget his exact title. A fellow named Jerry Lodierso, who, by the way, is one of the people charged with administering the stay-away list, which is used supposedly to keep LSA employees away from all the people on the list. Now, the company works through its employees. And I think to maybe pick a stark example, if a group of employees below Curtin's level, if Schwartz had just gone among all the other salespeople and said, you know, I've got this great information from language line. Let's use it. I'm going to divide it up with salespeople all over the country, but let's not tell anyone in management because we know we're not doing the right thing. Is there a chance in the world, if that had happened, that LSA could say, oh, sorry, we never saw this document. We don't know anything about it. We're not responsible under respondeat superior. They couldn't say that. But that's basically what they're doing here. Sotomayor. Yes. One of the issues that came up in connection with the motion to modify was treatment of certain GPO agreements. And as I understand it, the threshold or the gravamen of your initial claim is that your opponents obtained information through these refugee employees and either used or attempted to use or put themselves in position to use that information to solicit your customers and underprice you. While the record isn't completely clear in this case, the GPO agreements, as I understand them, are negotiated by the equivalent of a trade organization or a felicitator organization. MedEx was the one that brought to our attention. They do all the negotiating. They, in effect, solicit a discount for their members. And the agreement, if entered into, provides that vendors will service the GPO's customers at rates and under circumstances and conditions fixed by the GPO agreement. If that's true, how could your client possibly be harmed by any trade secret information they might have with regard to signatories to the GPO agreement? I would have to agree that the client coming in the door would not be affected by the trade secret list. That's self-evident. The question is whether the trade secrets can be used to exploit that relationship. What the trade secrets tell, whoever has them, is that these are prime customers of Language Line. It tells them, and if you look at the master list, it contains a whole lot of information about them. Now, a GPO customer comes in the door. Out of five customers, you know, obviously any company wants all the business it can get. But if they have the trade secrets, they're in a position to negotiate with that company, perhaps to go outside the GPO agreement, perhaps to have some advantage in further dealings with them that they would not have without the trade secrets information. So there is at least a potential. It's not quite the same degree of harm. But again, I have to say, I mean, it's almost unseemly. For LSA to be claiming, if you reach the point that they stole the list and they have the list and they can use the list to say, now that we've got that information, you know, let's carve this group of companies out of there so we are free to do anything we want with them with your information in hand. They, you know, maybe in that respect the injunction is perhaps somewhat more aggressive because the initial contact obviously couldn't be triggered by the trade secrets. But it doesn't follow that the range of protection is inappropriate. Because the over-breath, if the over-breath is can it be considered, it would seem that there's evidence in the record that they didn't, you know, that they didn't follow things, that they were found in contempt, that their one way to look at it is it's an out-and-out right theft from that, and that nothing that, you know, it sort of appears that the master and the district judge don't really trust a whole lot that LSA says from the nature of how it was taken and contempt situations that they've overcome. Can that be considered in deciding if it could it be not over-breath because their conduct is so bad? Or if their conduct had been better, would it then be over-breath? Your Honor took the words out of my mouth. The problem with both the GPO's part of the injunction, or rather with their arguments about the GPO and non-OPI part of the injunction, is that this is a company that has proven itself willing, or at least a certain number of its employees have proven themselves willing to take trade secrets, to exploit them, not to go through appropriate channels in dealing with the injunction, and looking at every opportunity. And I think we need to be realistic. These are salespeople. Their income depends on being aggressive salespeople. There's nothing wrong with that. But it is a factor to be considered in terms of how they behave as to whether they could be expected to observe any reasonable limits once the field is opened up to them. That's our big concern about them. What is the current status of the case in terms of going to trial or otherwise accomplishing a final judgment? My understanding is that fact discovery has been completed, and we would be going to trial, I think, relatively soon, but for Judge Ware's retirement. I don't know how that's going to impact it. But I guess I mean you've forced him to retire, and now there has to be a new judge? That both sides have exhausted the poor man? To look at the volume of paper, you might think so. So he won't be doing the trial? No. I think he's going to be. Because he's flat out retiring. He's not going senior. This month, I believe. That's right. My time just ran out. Well, if there did anyone have any questions? All right. Thank you very much. Thank you. Just two very quick points, given the questions from the court. If you remand this matter, which we hope you will, assuming you cannot reach the issues by yourselves at this level, then the issue is if the factual finding, however the revolver report gets resolved, if my side of that interpretation is accurate, then we still need you to desperately reach that issue of responding to superior as applies to trade secret law in the Ninth Circuit. Because I am extremely confident that we will be vindicated on that issue factually. The question will then be what happens as a matter of law in a trade secret case where we do not have, and I argue never did have, the bulk of this information. Number two, as Your Honor's question hints at, we're two-plus years into an injunction, again, without security, no set trial date. At some point, this data has to be stale to the point at which someone has to give it effective review. To say that we can be enjoined from 1,200 companies in an industry with stale data from the fall of 2009, that data is three years old by the time Your Honor's likely ruling this case, that has just evaded review, never commented on by the special master and approved by the judge under the incredibly wrong standard. At some point in trade secret law, you cannot continue to make the arguments that opposing counsel made so eloquently because they're just not trade secrets anymore. The pricing from three years ago cannot serve as the evidentiary predicate to keep you out of an entire industry without a bond for three-plus years. And last on that point, all of the issue and the discussion the court has had with us about contempt, at some point you have to ask, has that now become the punishment phase of a civil contempt ruling because it now bleeds into credibility? That was a period of time between an order of the court and an order of the special master where there was ambiguity in our view as to what it meant. Our client religiously followed the initial order. It religiously followed after that 83-day period. If you're found guilty of contempt. Not discounting that. That doesn't, the ambiguity goes out the window there. I agree. But again, as we noted in our brief, the due process violations that have occurred here are tantamount. There has never been a trial, a contempt without a live witness ever being heard in a case is unheard of. I couldn't find a case where that's ever happened before. It's certainly not in this circuit. We will be vindicated on that point as soon as we finish the proceedings to get an order that we can appeal here. But for the moment, I urge this Court, do not let what happened during that shake-out and interpretation period for 89 days color what occurred here in the absence of the evidence that is extending an injunction like this without security for this duration of time in a case between two very aggressive competitors. Thank you. All right. Thank you both. Counsel, one question before you sit down. Have there been any discussions with Judge Ware about the transfer of the case and getting it to trial? Ironically, we have had almost no communication with Judge Ware since the outset of this case. I entered the case in late 2010. I've never appeared in front of him. We try a phone call politely to the district court at least once a week to find out who the new judge will be, if a magistrate judge will be appointed, if there's anything we can do to get some aggressive management of all of this going on, given the staleness of the underlying data. And I think both sides would represent to you that we are in limbo as to who the new judge will be, when that will occur, and if there will even be a new judge. There is no current magistrate judge monitoring those aspects of the case? Not as far. I think a magistrate judge, if I'm correct, entered the very initial protective order before I was involved. But everything has been delegated to the special master in this case. We are not actively involved in front of the trial judge or the magistrate judge in this ñ in the Northern District of California. Thank you, Your Honors. Thank you both for your helpful argument in this matter. This will stand submitted. And we call the next matter on calendar. Robert Lynn Scholes v. Robert ñ well, versus ñ let's see. Robert Lynn Scholes v. Robert Lynn Scholes at all debtors v. Robert Lynn Scholes at all appellees, 11-60023. Your Honor, likewise, I will be the only part attorney arguing. I'd like to reserve two minutes for rebuttal. May it assist the Court, Kevin Anderson for Michael H. Myers, Chapter 13, Trustee for the District of Utah. Your Honors, this issue involves a matter that has vexed courts and practitioners since its implementation in October of 2005, resulting in the exact ñ or the general issue of what should be repaid to creditors twice being taken up to the Supreme Court in the Lanning and the Ransom case. In this particular case, there's ñ the parties agree that the appellate panel correctly determined that the railroad retirement was included in the determination of current monthly income pursuant to the statute 10110A. Appellant asserts that the bankruptcy appellate panel erred when it held that the monies that qualify as current monthly income must be listed in the means test, which has been memorialized by the Form B-22C. The means test is the mechanism Congress designed in order to ensure that debtors who can pay creditors do pay creditors. And I'm taking these quotes from Lanning, that debtors return the maximum amount to creditors, and that creditors not be denied payments that a debtor could easily make. So in short, by adding ñ Exactly is the difference between the amount of money that these debtors could apply during the time covered by the ñ by the plan, the difference between the amount of money they could apply to their debts if the railroad funds are anticipated to be included, and the amount if they're not. When you say anticipated to be included, you mean in the calculation of projected disposable income. Right. In other words, if I understand it correctly, and by all means correct me if I'm in I have a lot of debts I can't pay now. My creditors are at the door. I want additional time to pay off my creditors. And I'm prepared to allocate this amount of money over my subsistence expenses to meet my debts. And I want the plan to go on for X period of time. But I can't meet all my debts. I'm going to have to get part of my debts forgiven. So I'm trying to figure out what's the difference in terms of what has to be forgiven between the two alternative ways that are being discussed. Well, the ñ it's the ñ it's the trustee's position that current monthly income, that projected disposable income is a subset of current monthly income, and that what is included in current monthly income inherently must be included in projected disposable income. Now, the court asks what's the difference in the outcome of this case. The Form B-22 requires debtors to list all current monthly income, as that term is defined. It then allows debtors to deduct certain expenses as established by the IRS And then it results in net monthly income that, when multiplied by the applicable commitment period, 36 or 60 months, is the amount that must be returned to unsecured creditors. So it's different than calculating in a payment. It's calculating the return to a specific class of creditors, namely unsecured creditors. And the Form B-22C has not been filed that calculates that amount, but the trustee asserted in the objection that the return to creditors, if the B-22C is strictly followed, would be greater than the proposed return in the debtor's plan. Okay. So Robert Schultz gets $3,709.25 per month, right? Yes. And his income comes from the railroad retirement, right? Exclusively. And then Mrs. Schultz gets $3,822.98. Working at a title company, yes. So the BAP ruled against you, and... Well, it was we won one side and lost the other. But you lost enough that you're here. Exactly. From the standpoint, is it your position that where exactly did the BAP go wrong regarding its reading of, I guess, Hamilton and Esquerdo? Well, in two aspects it erred. The Lanning decision is relevant to this appeal only for purposes of determining that it's not applicable to the facts of this appeal. And let me explain that. Lanning states that the B-22C creates a presumptive required return for creditors that must be paid for the debtor to qualify for a discharge. Lanning further holds that a bankruptcy judge retains some discretion in order to adjust that number, but subject to the predicate that the debtor establish a known or virtually certain change in their income or expenses. Well, can you – okay, I think what you're saying, though, is you're saying that Lanning may have identified the exclusive circumstances in which courts have discretion to depart from the presumptive figure, but it seems that also that it didn't foreclose reference to other statutory commands. And if 231M does require the RRA benefits to be excluded from the PDI, which is what I guess the Schultz's argue, it seems that nothing in Lanning would preclude from giving effect to that statute. So it seems that you can't resolve the case stopping at Lanning. You still have to look at 231M. Well, Your Honor, I think what we're – Because you want to stop at Lanning, right? No. We think Lanning does not apply because there's not been any change in the debtor's circumstances. And as Lanning says, the B-22C creates a presumptive return to creditors and can only be rebutted by the debtor showing a change in financial circumstances. So as was argued at the BAP, and we agree the BAP correctly ruled, the Railroad Retirement Act is not included in the definition of current monthly income under 101A. Therefore, it is – Well, didn't the BAP say that the forward-looking approach required in Lanning meant that the courts were necessarily anticipating future income and calculating  And so because 231M prohibits the anticipation of RRA benefits, they cannot be included. Is that what the BAP said? Yes. And so – but doesn't that conclusion depend on Iscardo? Well, that's the area where we think the BAP erred as well. That they didn't interpret Iscardo correctly. Exactly. That they viewed anticipated as the same as being synonymous with projected. And while conversationally they may be synonymous, statutorily they are not. And in Iscardo, the court went to great lengths to define the term of anticipate, finding a lack of legislative history, finding a lack of other statutes that have that exact same term. Iscardo was the one where the person got a one-time payment, right? No, that's Lanning, Your Honor. Oh, that's Lanning. Okay. I'm sorry. Iscardo is the basis for the court finding that anticipated is synonymous with projected. Therefore, if it's projected, it can be excluded. Our position is that the term anticipated in Iscardo means something very different. And in Iscardo, the court determined that the meaning of anticipated was that the debtor would not get those proceeds until he received them. And, of course, part of that is to protect those proceeds from the attachment of creditors. But there is nothing in Chapter 13 that involves a compulsory means by which the debtors can be compelled to contribute that money. So, one, the protection isn't required. Two, that the debtor is not spending money before they receive it under the trust is addressed by the fact that the plan does not require a lump sum payment up front. It's essentially a contract that each month the debtor will pay X amount. I think it's oh, yes, yes, please, Your Honor. Can I just ask you one, just to go back to the statement you just made. So why is it wrong to look at this as kind of an indirect form of attachment? Right? You just said that the debtor is not being compelled, you know, to pay to a specific creditor necessarily a sum certain from his benefits. But isn't that in effect what's going on if you include the benefits within projected disposable? Well, Chapter 13 is completely involuntary or voluntary in filing. There was no means to compel someone to file Chapter 13. In addition, the amount to be contributed by the debtor is voluntary. The B-22 simply establishes the price the debtor has to pay to qualify for the extremely broad discharge under Chapter 13. If the debtor doesn't want to pay the price, he doesn't get the discharge. There's been no harm. He's in the exact same position that he was before he filed for bankruptcy. And that's why the Lanning decision is important, because Congress said in interpreting the means test, it should be done in a way to ensure that credit, that debtors pay the maximum they can afford to creditors. That was the purpose of the means test, was to accomplish that. And Congress did make a policy decision to exclude Social Security income from the calculation of current monthly income. It made no other policy decision regarding any other income that's derived with an anti-assignment, anti-anticipation cost. Counsel, the dispute apparently is coming down to varying definitions of the term anticipating. In the divorce case, if I understood it correctly, what happened was the court essentially took a net present value of future income stream, divided it by the debtor, divided it in some way between husband and wife, and assigned the wife current assets to cover what otherwise would be received over time. Yes. So you can't do that. As I understand it, under Chapter 13, there's no assignment by the debtor of any income to be received in the future presently. All he's doing is promising, as he gets the money, he will pay a percentage of it to his creditors. Is that your understanding? Yes, Your Honor. I would completely agree with that. All right. Following up on Judge Watford's question, what if the debtor is optimistic in predicting his future income, and Congress decides to do away with the railroad protections or whatever, and involve the poor debtors in years of litigation? So he doesn't have that amount of money when the time comes. Is there provisions or is there an opportunity to amend the plan? Yes. There's a statutory mechanism to address that exact situation. Section 1329 says the debtor can come in at any time and ask the court to revisit what amount should be paid to unsecured creditors based on a change in financial circumstances. And we see these motions all the time. They're very common in Chapter 13. Well, he's not assigning any money. He's not committing any money. He's not, in effect, using any money for security. He's simply saying, if I have it, I'll pay it. Exactly.  in any shape or form. If they lose your job or if they stop paying your retirement as the Federal Government says, then you can come back and say, well, I don't have this. This is what my income is now. Exactly. And that's why they use the term projected, because in Lanning they explain you take historical information and you make the best projection you can as to what should be required at the confirmation hearing. But these cases go three to five years, and the vicissitudes of life are always going to impair the debtor's ability to complete a plan. Well, if we affirm what remains to be done in the bankruptcy court if we affirm the BAP? Well, the BAP decided the strict legal issues as to what is included and what is excluded. So basically, we go back and we do the math. You fill out the Form B-22 as directed by the BAP. You pick the number, and life goes on. And that's why the appeal was taken at this juncture, so that we didn't have to go back down, redo that number, and then take the issue up on confirmation. Oh, and from the flip side, if we reverse the BAP, then you just go back and put in more numbers. Pardon? If we reverse the BAP, then it's included. So is it any different whether we affirm or reverse? You still have to go back and crunch numbers, right? Exactly. And it would simply be a matter of you have to include the railroad income in Part 1 of the B-22, because it's current monthly income. You get down to Part 5, it allows debtors to deduct expenses under special circumstances. And in this case, that's where the debtor would say, well, I'm excluding this amount of money because I assert that it's not included. But whether we reverse or affirm, it still has to go back and put the right numbers  Absolutely. Yes, Your Honor. And to determine what should be repaid to creditors, that would be the calculation that would be performed. Can I ask just one more question? Does this come up a lot, this particular? Well, as to the Railroad Retirement Act? Yes. No. But the language referred to in the BAP that suggests any anti-anticipation or any anti-assignment clause. Those clauses are found in thousands of private and public annuities. For example, the teachers in California. Well, I think a judge's retirement is we have to – I think some people, if they get divorced before they can actually retire, like, if you walk away before you can retire, you don't get anything. So you have to make what's called the Rule of 80. So if they were getting divorced before that, what sort of interest would the spouse have in something you might never get? But then you might get it, too. I'm not following why – Well, see, we don't – if we don't make the – you know, there are people that you have to work – we have what's called, like, you have to work until you're 65, and that means – and plus 15 years of service. So if you leave when you're 64 and you have 14 years of service, you don't get anything. You walk away from no retirement. If you make it until you're 65 and with your 15 years, then you get your salary for the rest of your life. And so the question is – Someone was getting divorced at, say, 63, and the other person said, well, I want half of that retirement when they get there when they're 65. Well, if they don't make it to 65, there's nothing there. Yeah. And as the Court has observed, though, in this case, you project based on best present available information, but the code allows for modification based on change in circumstances. So you could come back and say, I'm not getting a retirement now. I need to amend my plan so that it reflects, per the B-22C, what I can reasonably be able to pay. Thank you. We've used more than your time, but if the panel has any questions after we go to the other side, we'll allow the panel to ask them.  Thank you, Your Honor. Good morning. My name is Gary Huss. I represent Robert and Carolyn Schultz. I've thought about what's in my brief, and I believe that my brief pretty much covers the issues. I don't want to repeat any of that. I'd kind of like to start out by just touching on some of the questions that were raised by the three of you. Well, we assure, I mean, you obviously know, and I think all parties should be assured that the judges read all the briefs before and prepare, so you don't have to repeat what's in your briefs, because we do know that. I understand. Counsel, maybe I can just focus you on the issue that concerns me the most, because it didn't follow it. Just explain to me how you interpret the ruling in Hiscioto as supporting the outcome of the PAC here. Well, when I looked at that case, I felt that the court was drawing from it the notion that Congress had intended to protect and shield railroad retirement recipients from creditors. And in that divorce setting, it looked like the court was trying to do that, to uphold the anti-alienation, anti-garnishment provision to protect those benefits from being anticipated. And that's what I think is happening here, is contrary to what counsel has suggested, when you do the means test calculation to determine disposable income, that is setting an amount that the debtor has to commit to pay on a monthly basis as his plan payment. It's not something that he's saying, well, if I have it, I'll pay it. No. He's going to pay it unless he can come into court and modify it later. But Congress, under 231M, has said, we don't want these benefits to be anticipated, period. But the court in Hiscioto, though, construed the word anticipate or the term anticipation to encompass this body of trust law that has a very different concept of anticipation than what you're talking about. That's my problem. Just help me work through that. When I – well, the word anticipate to me means to count on it, to assume it's going to happen. Okay, but all I'm saying is that we've got a Supreme Court case that interpreted the exact word you're relying on in a totally different way, right? So just how do you get from the way the Supreme Court construed anticipation to the reading you want us to get here? Well, I don't think that – what I'm saying is the BAP used that particular case, the divorce case, to support its reasoning as to how it reconciled the different statutes and Hamilton v. Lanning and that case altogether to come to the conclusion that you couldn't anticipate the railroad retirement benefits that should not be part of the disposable income calculation in bankruptcy. So that's where my focus was. So I don't understand. I mean, the Supreme Court may have gone off on another avenue in Hiscioto, but that wasn't my focus. My focus was it appeared to me that that case was consistent with Lanning and saying that barrier is a valid barrier that has to be given due regard in the bankruptcy context, and that's where I stopped. Well, I mean, what the court there said was that certainly you can't – you couldn't use the present value of all of these anticipated benefits. You couldn't sort of reduce that to present value and then offset that against other property that the couple was trying to split up. So the court construed anticipate in that sense to get basically the value of the benefits before they were due to you, and I just don't see that happening in the context we're talking about here. There's no present value reduction of the anticipated RRA benefits that's being used somehow to determine how much the debtor has to pay. Well, we're not dividing up assets like they would in a divorce court. What they're trying to do here is project into the future the revenue or income that a person is likely to receive. And Congress has said you don't count that, much like it's done with Social Security. But is there any reasonable likelihood that the RRA benefits will vary in the future? Could you repeat that? Is there any reasonable likelihood that Mr. Schultz's railroad benefits will vary in the future? That's a good question because when I look at it, you know, frankly, you know, it's like a lot of other retirements. You kind of look at it and say, well, he's probably going to get it. And the only answer I have to that is I go back to 231, you know, and where it says, but you're not supposed to count it. You're not supposed to anticipate it. I mean, Congress has said that. Well, counsel, it's clear that M would be violated if the bankruptcy court required the debtor to, as part of the plan, to assign future income from his retirement to his creditors. Or to the bankruptcy trustees. So it would flow without going through him. That would clearly be an anticipation of an income stream to be received in the future. But I think the panel is having trouble equating that with a situation where basically he is saying, I will pay this money in the future in order to obtain certain benefits under the bankruptcy code. But I have an escape valve. If I don't have the money, I can come in and modify the plan. So there's no preassignment of his income stream, is there? Well, there isn't something that I would call an assignment. What there is is a written commitment. He's submitting a plan and signing it saying, I am going to commit to pay this money, which will include part of my railroad retirement benefits, which is exactly what I think 231M says you're not supposed to count. And that's why I think the BAP was correct. So you're saying the money is exempt? Yes. I'm saying that the bankruptcy appellate panel was correct in its reasoning. But doesn't the statute identify subsistence expenses and various things as exempt and not include this? Correct. Okay. But are you talking about 10110A? Mm-hmm. I believe that's in the CMI calculation. But it still doesn't do away with the 231M, the Railroad Retirement Act itself. I think as the BAP was saying, you don't look at bankruptcy laws in a vacuum. That's why it asked the question to opposing counsel during argument, are you saying that 231M is irrelevant? And their position was, yes, it's not relevant. The BAP said, no, you have to look beyond bankruptcy laws also. You have to reconcile other congressional statutes that come into play, and 231M is one. So I don't think that you can view the bankruptcy laws in isolation here when it comes to the Railroad Retirement Act. I think, obviously, I think that you both make points that say to us that whatever this Court decides, we have to publish. And I think the bankruptcy court published, too, didn't it? Mm-hmm. So that would mean that whatever we say, whether we reverse or affirm it, would have to be published and be binding, unless the Supreme Court decides that we get it wrong. Did you have anything additional? I have no other. The panel does not have any additional questions, and I don't think we have any additional time. All right. Thank you both for your arguments. This matter will stand submitted. The Court is currently in recess for the week. All rise.
judges: Singleton, Callahan, Watford